**KINGFISHER HOSPITALITY, INC., Respondent,**

v.

**Ben BEHMANI, Appellant.**

**No. SD 30446.**

Missouri Court of Appeals, Southern District, Division One.

Jan. 27, 2011.

Jeffrey D. Zimmerman, Shawnee, KS, for Appellant.

Harold F. Glass, Springfield, for Respondent.

ROBERT S. BARNEY, Presiding Judge.

This litigation arises out of a contract for deed. Ben Behmani ("Appellant") appeals the Judgment of the trial court which found in favor of assignee Ocean Hotels, LLC ("Respondent") on Count I of assignor Kingfisher Hospitality, Inc.'s ("Kingfisher") second amended petition which sought a declaratory judgment to determine: if Appellant had a claim to the real estate described in the contract for deed; if there was a balance due under the contract for deed and, if so, the amount owed; and if Respondent was entitled to reasonable attorney's fees and costs. Following a bench trial, the trial court determined Respondent was "entitled to quiet title relief including a declaration that it was the owner of the Hotel property after October 6, 2008;" that "attorney's fees of $9,819.00 incurred by [Respondent were] reasonable ... and ... recoverable [against Appellant] as damages under the [C]ontract and [the N]ote;" and that while Appellant's recording of his "Affidavit of Equitable Interest" was "wrongful" and "slandered [Respondent's] title to the Hotel," there was no evidence of any further damage suffered by Respondent. The trial court

also denied all three counts of Appellant's counterclaim premised on allegations of breach of contract; conversion of personal properties; and deprivation of his equitable interest in the real property in question.[1] Appellant now raises three points of trial court error. We affirm the judgment of the trial court.

Viewing the evidence in the light most favorable to the judgment, *Martin v. Reed,* 147 S.W.3d 860, 861 (Mo.App.2004), the record reveals that in the late summer of 2006 Appellant purchased the Grand Royale Hotel ("the Hotel"), located in Branson, Missouri, from Kingfisher Hospitality, Inc. ("Kingfisher").[2] The Hotel consisted of ninety hotel rooms as well as various amenities such as an indoor swimming pool and hot tubs. The parties executed a "CONTRACT FOR DEED" ("the Contract") in August of 2006, which stated that the total purchase price of certain real estate would be $1,700,000.00 and Appellant agreed to pay Kingfisher $300,000.00 up front and executed a "PROMISSORY NOTE" ("the Note") for the amount of $1,400,000.00, payable at the rate of nine percent interest per annum.[3] The Contract also provided that Appellant

shall cause to be prepared and shall execute and place in escrow ... a Quit–Claim Deed, containing a release by [Appellant] of any and all rights to the [Hotel]. Said Quit–Claim Deed shall be delivered to [Respondent] immediately following the date that [Respondent] exercise[s its] option to declare th[e Contract] to be null and void.

Likewise, the Note provided that "in the event of default under this [Note] [Appellant] is not responsible for any *deficiency in the payment* of [the Note] should ... [Respondent or assigns] receive possession of the real estate . . . ." [4] (Emphasis added.)

---

1. The trial court found Counts II and III of Respondent's petition were moot based on its determination as to Count I.

2. On January 18, 2008, Kingfisher transferred its interest in the Contract, the Hotel, and attendant business to Respondent by an assignment of the contract for deed, a bill of sale of business, and a warranty deed. Respondent was later substituted as plaintiff in this litigation and is now Respondent herein.

3. The settlement statement for this transaction showed Appellant paid Respondent $304,456.00 at the time of closing.

4. The Contract further provided at paragraph 12 that Appellant

acknowledges that a default in the payment of the ... Note ... shall constitute a default under the terms of th[e] Contract. If [Appellant] fails to make any payment required under th[e Contract], including the [Note] ... within ten (10) days from the due date thereof or fails in any manner to comply with the terms of th[e Contract], [Respondent] shall notify [Appellant] in writing ... of said failure ... and [Appellant] shall have thirty (30) days following receipt of said notice to comply with the terms of th[e] Contract. If [Appellant] does not comply ... by the end of such thirty (30) day period then [Respondent] shall have the option to declare th[e] Contract to be in default. If such would occur, all amounts theretofore paid by [Appellant] to [Respondent] under the terms of th[e] Contract ..., including the ... Note ... would be *forfeited as liquidated damages and not as a penalty.* It is understood by both [parties] that upon expiration of the default time, [Appellant] will immediately release possession of the [Hotel property] to [Respondent]. It is expressly understood and agreed between [the parties] that time is of the essence ... and that if [Appellant] shall, prior to transfer of Warranty Deed ..., *fail to pay any installments under the ... [Note] ... when said amount shall become due and payable, and after proper notice is given, that in that event the amount theretofore paid by [Appellant] under the [Note] and all other amounts paid, shall be forfeited to [Respondent] as liquidated damages for breach* of th[e] Contract and on such default, it will be lawful and proper for [Respondent] and/or Assigns to take possession of said premises.
(Emphasis added.)

Problems between the parties relating to the payment of real estate taxes and monies owed under the Note began to arise almost immediately thereafter. Kingfisher claimed Appellant was in default for failing to abide by the terms of the Contract and the Note; however, Kingfisher permitted Appellant to cure these defects "two or three times" even after providing him written notice of default. On May 21, 2007, Kingfisher, again, notified Appellant in writing that he was in default of the terms of the Contract and the Note and Appellant was advised he had 30 days to pay Kingfisher the amount of $25,822.00. On August 15, 2007, Kingfisher informed Appellant in writing that he remained in default on the Contract and the Note; that his time to cure the default had "now expired;" and advised him that it was allowing him an additional seven days in which to pay the sum of $32,362.30 to cure the default. On September 13, 2007, Appellant's counsel advised Kingfisher that his position was that there were no outstanding monies owed to Kingfisher and that Appellant was not in default. Kingfisher responded by filing a petition with the trial court on October 4, 2007, alleging a breach of the Contract and the Note due to Appellant's default.

While this matter was in the early stages of litigation, as previously related, Kingfisher assigned its interest in the Contract and its attendant business to Respondent in January of 2008, and executed a Warranty Deed on the Hotel property as well as a bill of sale in favor of Respondent.[5] Respondent then notified Appellant in writing on August 5, 2008, both at the Hotel's address and at the address for Appellant's management company, that Appellant remained in default per the terms of the Contract and the Note such that he owed Respondent in excess of $70,000.00. The letter advised Appellant he had thirty days to cure the default. Although Appellant did not specifically respond to the letter, he did pay Respondent $5,000.00 after receiving the letter and this payment was accepted by Respondent.

Citing Appellant's failure to pay the entire amount in default under the terms of the Contract and the Note, on October 6, 2008, Respondent filed the previously prepared Quit–Claim Deed in the recorder's office of Taney County, Missouri. Ms. Garey, as Respondent's representative, then took a copy of the filed deed to the Hotel "to take possession of the property." To effectuate this purpose, Ms. Garey and another representative of Respondent together with a prospective manager for the Hotel invited by Ms. Garey, Appellant's brother, the current manager for the Hotel, and a business associate of Appellant met to effectuate this purpose.[6] Respondent then began operating the Hotel; however, less than sixty days later, Respondent closed the Hotel due to "problems" with the Hotel itself and lack of business.

On December 11, 2008, Appellant recorded an "Affidavit of Equitable Interest" with the recorder's office of Taney County. In this affidavit, Appellant swore he maintained an equitable interest in the Hotel based on the Contract. Around this time, Respondent sold the Hotel for $1,700,000.00 to a third party; however, Appellant's recorded affidavit operated as a cloud on the Hotel's title.

As previously set out, on July 7, 2009, Respondent filed a "Second Amended Petition" against Appellant in three counts. On November 5, 2009, Appellant filed his answer to Respondent's second amended

---

5. The sole owner of Respondent is Fran Garey ("Ms.Garey").

6. It appears that from August of 2008 through October of 2008 Appellant was hospitalized. He was not present at this meeting.

petition as well as a three point counter-claim. A trial was held on January 19, 2010. On February 4, 2010, the trial court entered its Judgment in favor of Respondent on its Count I. The trial court also found "[t]he issues in Counts II and III of the second amended petition are covered by the judgment on Count I, therefore, Counts II and III are declared moot." Additionally, all three of Appellant's counterclaims were denied and Appellant's affidavit of equitable interest was determined "void and of no effect." This appeal followed.

"In a court-tried case, we will affirm the judgment of the trial court unless it is unsupported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law." *Kassebaum v. Kassebaum*, 42 S.W.3d 685, 692 (Mo.App.2001); *see* Rule 84.13(d).[7] "We accept the evidence and inferences favorable to the prevailing party and disregard all contrary evidence." *Kassebaum*, 42 S.W.3d at 692. "We defer to the factual findings of the trial court, which is in a superior position to assess the credibility of witnesses." *Id.* "However, we independently evaluate the trial court's conclusions of law." *Id.*

In his first point relied on, Appellant maintains the trial court erred in "not treating the parties' contract for deed as a mortgage because Missouri law should be changed to treat contracts for deeds as mortgages in that applying mortgage law to contracts for deed would prevent forfeiture of substantial equity and unlawful repossession of real property."[8]

■ Appellant's Point I fails to comply with Rule 84.04(d)(1) which states:

(1) Where the appellate court reviews the decision of a trial court, each point shall:

(A) identify the trial court ruling or action that the appellant challenges;

(B) state concisely the legal reasons for the appellant's claim of reversible error; and

(C) explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error.

The point shall be in substantially the following form: The trial court erred in [identify the challenged ruling or action], because [state the legal reasons for the claim of reversible error], in that [explain why the legal reasons, in the context of the case, support the claim of reversible error].'

Appellant's point relied on contains no legal reason for his claim of reversible error

7. All rule references are to Missouri Court Rules (2010).

8. We note a contract for deed has been described in the following way:

'[a]lthough a contract for deed and a mortgage serve similar economic functions, (i.e., the financing by the seller of real estate of an unpaid portion of the purchase price), the purchaser under a contract for deed is not a mortgagor. A contract for deed, also referred to as an installment land sale contract, is used as a substitute or alternative to a mortgage or deed of trust. Under a contract for deed, the buyer of real estate makes a down payment and agrees to make remaining payments at a specified rate of interest in installments to the seller. The buyer normally takes possession of the property at the time the contract for deed is made. The seller agrees to convey the property to the buyer by delivering a warranty deed upon completion of the installment payments. Unlike a mortgagor who holds legal title to the mortgaged property, the buyer under a contract for deed does not receive legal title to the property until the contract price is paid and a warranty deed delivered by the seller. Prior to this event, the buyer has only an equitable interest in the property.'

*In re Estate of Sommerer*, 211 S.W.3d 123, 124 (Mo.App.2007) (quoting *Long v. Smith*, 776 S.W.2d 409, 413 (Mo.App.1989)).

nor an explanation as to how that legal reason supports his claim of reversible error. Appellant merely argues the law in this area should be changed. Further, in the argument under this point relied on, Appellant fails to ask this Court for any particular remedy and does not request this Court to take any action in his favor other than to change the law. Appellant's point is not in compliance with the applicable Missouri Court Rules and will not be reviewed. *See Weisenburger v. City of St. Joseph*, 51 S.W.3d 119, 123 (Mo.App.2001). Point I is denied.

In his second point relied on, Appellant asserts the trial court erred in ruling that Respondent "lawfully took possession of the [H]otel after the claimed default...." He maintains that state law

> requires that a property owner who seeks to reclaim possession of real property may not do so by force of deception but must resort to the remedy provided by law in that the uncontroverted evidence in this case established that [Respondent] did not take possession pursuant to a court order or [Appellant's] voluntary surrender of possession but rather, [Respondent] took possession by force or deception.

Additionally, in his third point relied on, Appellant asserts the trial court erred in ruling against his "counterclaim alleging that [Respondent's] retaking of the property by force or dec[e]ption deprived him of his equity in the property...." Appellant maintains that state law

> provides that a party who uses force or deception to retake property shall be liable in damages for such conduct in that the uncontroverted evidence in this case established that [Respondent] did not take possession [of the Hotel] pursuant to a court order or [Appellant's] voluntary surrender of possession but rather, [Respondent] took possession by force and deception.

We shall address Appellant's second and third points relied on conjunctively.

Here, Appellant was in default under the terms of the Contract and the Note at the time Kingfisher assigned its interest in those documents to Respondent. In fact, the present legal action was already pending at that time and Appellant had been notified of his default on numerous occasions by Kingfisher. When Respondent became involved, it also notified Appellant he was in default by mailing him a written letter at both the address of the Hotel as well as at the address of his management company. Respondent also advised Appellant that he had thirty days to cure the defect as set out in the terms of the Contract. When Appellant failed to pay the $70,000.00 owed under the Note and the Contract within thirty days of proper notice being issued, Respondent filed the Quit–Claim Deed which had been prepared in 2006 in conjunction with the original transaction between Appellant and Kingfisher. On October 6, 2008, Respondent then entered the Hotel and took possession of it as contemplated by the Contract, which set out that upon default and forfeiture "it will be lawful and proper for [Respondent] and/or [its] Assigns to take possession of said premises" and that "upon [Respondent's exercise of its] rights to possession of the real estate due to default by [Appellant], that [Appellant] shall then be required to exit the premises." Nevertheless, Appellant argues that regardless of the terms and rights granted by the Contract to Respondent, "Missouri law is clear that self-help repossession is not an available option in this circumstance."

In support of this assertion, Appellant cites to *Steinke v. Leicht*, 235 S.W.2d 115 (Mo.App.1950), and *Sackett v. Hall*, 478 S.W.2d 381 (Mo.1972). In *Steinke*, 235 S.W.2d at 117, the plaintiffs leased from the defendants sixty acres of farmland

upon which was built a "five room club house." The lease agreement provided, *inter alia*, that upon "'any forfeiture of this lease, [the defendants] or assigns shall be entitled to and may take immediate possession of said ... premises ... without further demand or notice.'" *Id.* The plaintiffs, apparently through some sort of misunderstanding, fell behind on their rental payments and were notified by the defendants that their payments were in arrears. *Id.* at 118–19. Thereafter, the defendants essentially broke into the locked clubhouse on the property, removed all of the plaintiffs' belongings, and placed new locks on the doors. *Id.* at 119. The defendants then placed all of the plaintiffs' belongings into a storage unit, notified the plaintiffs of their actions, and advised the plaintiffs the storage fee was $15.00 per month. *Id.* at 117. The plaintiffs then brought an action against the defendants for "forcible entry and detainer." *Steinke*, 235 S.W.2d at 120. Following a bench trial, the trial court found the defendants liable for "forcible entry and detainer as charged in the complaint, and that the plaintiffs were entitled to restitution of the premises described." *Id.* The defendants then appealed. *Id.*

Citing several reasons for affirming the decision of the trial court, the reviewing court set out the following discussion in relation to the forcible entry and detainer issue:

> there is another reason which compels us to hold against [the] defendants on this point. The procedure of [the] defendants in forcibly entering the premises in August 1946, and removing therefrom the property belonging to [the] plaintiffs was clearly erroneous and wrongful. As was held in *Beeler v. Cardwell*, [33 Mo. 84, 86 (Mo.1862)], the plaintiffs, if in actual, peaceable possession, could not be legally ejected by force. If the defendants had superior right to the possession, the law provides

ample means for enforcing it, and [the] defendants were clearly wrong in taking the law into their own hands. However, the question of right does not arise in this action of forcible entry and detainer and the defendants cannot set up their supposed right as a defense for their forcible entry. In the action of forcible entry and detainer the question to be determined is merely whether there has been a forcible entry upon [the] plaintiffs' possession by one who detains the possession from him. The rule has been clearly declared by our courts as follows: '[i]t is immaterial in what capacity or relation a plaintiff is in possession, whether as owner, tenant, agent, or otherwise.' If he is in fact in peaceful possession, then, no matter what may be the defendant's right to possession, the law does not permit the latter to vindicate his right or redress his grievance by force; and, if he does so, the law will restore the original status and compel the defendant to assert his right by legal proceedings. The purpose of the forcible entry and detainer statute is to preserve peace and prevent the use of force and violence in asserting one's supposed right to the possession of real property.

*Id.* at 123 (internal citation and emphasis omitted). Accordingly, the reviewing court held in favor of the plaintiffs. *Id.*

In *Sackett*, 478 S.W.2d at 382, the plaintiff brought an action for damages for the "value of personal property alleged to have been taken" and for actual and "punitive damages claiming conspiracy to deprive the plaintiff of his business." The plaintiff's claims were based on his purchase of a "filling station operation" from defendant Hall, which was subject to a lease agreement between Hall and a third party, defendant Roco Petroleum Group ("Roco"). *Id.* The contract provided Roco or the lessee could terminate their contract by giving ten days written notice, and that

upon termination of the contract Roco "may 'reenter the premises with or without process of law and expel, remove or evict [l]essee using such force as necessary.'" *Id.* at 383. Roco then gave the plaintiff written notice of its intention to cancel the contract and thereafter

> took possession of the station, changed locks, and locked in the station the personal property covered by Hall's chattel mortgage [agreement with the plaintiff]. Other personal property of [the] plaintiff, not included in the chattel mortgage, was placed outside the station. [The p]laintiff took it away and it is not involved in this action. Hall took possession of the mortgaged personal property, advertised a foreclosure sale ... and bought this property at the sale.

*Id.* at 382–83. Following a jury trial, the trial court "directed a verdict for the defendant on the second [conspiracy] count ..." and "found for [the] plaintiff against both defendants ... on the first count for the value of [the] plaintiff's personal property and for ... Roco on its counterclaim" for rent payments that were never made. *Id.* at 382. The defendants Hall and Roco appealed. *Sackett,* 478 S.W.2d at 382.

On appeal, the reviewing court explained that

> [the d]efendants' real claim is that the evidence shows that possession of the chattels was taken by defendant Hall, after [the] plaintiff was legally dispossessed from the service station, under rights claimed by him under the chattel mortgage. It is true as [the] defendants say the lease to [the] plaintiff provided for its termination on ten days' notice. However, our view is that the jury could reasonably find that [the] defendants acted improperly in forcibly taking possession of the station and the mortgaged property over [the] plaintiff's protest. *[The d]efendants had police officers there to prevent [the] plaintiff from do-*

*ing more than protest.* The lease did provide when the lessor declares the lease ended the lessor may reenter the premises with or without process of law and expel, remove or evict [l]essee using such force as necessary. The Supreme Court of Ohio has held a similar provision in a chattel mortgage void as contrary to public policy. A provision in the lease expressly permitting a forcible entry would be void as contrary to the public policy, as set out in forcible entry and unlawful detainer statutes. [Further,] [a]n increasing number of jurisdictions uphold what seems to be the modern doctrine that a landlord otherwise entitled to possession must, *on the refusal of the tenant to surrender the leased premises, resort to the remedy given by law to secure it;* otherwise he would be liable in damages for using force or deception to regain possession.... We hold here that the jury could reasonably find that there was a wrongful taking of [the] plaintiff's property.

*Id.* at 382–83 (internal citations omitted) (emphasis added). As such, the appellate court affirmed the trial court's ruling that the defendants wrongfully interfered with the plaintiff's interest in his property. *Id.*

■ The present matter is not akin to either *Sackett* or *Steinke* for several reasons. Here, the record shows there was no forceful taking. The dealings between the parties were even characterized by the trial court as being "cordial." There was no breaking into the Hotel as was the situation in *Steinke,* where the defendants broke into the plaintiffs' clubhouse. Also, there was no overt show of force as in *Sackett,* where there was police involvement, words were exchanged, locks were covertly replaced, and there was deception by the defendants. Furthermore, in both *Steinke* and *Sackett* there was an issue raised as to whether, indeed, there had

even been a default by the injured parties. That is not the case in the matter before this Court.

■ Also, the claims framed in Appellant's counterclaim and argued to the trial court differ from those found in *Steinke*, a case dealing with forcible entry and detainer implicating statutory remedies such as section 534.030, and *Sackett*, a case involving the conversion of mortgaged property by the chattel mortgagee and the chattel mortgagor's lessor. Neither of these cases dealt with a land conveyance under a contract for a deed.[9] Instead, the issue before this Court clearly involves contract interpretation. "Contracts for deed have traditionally been governed by general principles of contract law and courts have enforced forfeiture clauses on the assumption that they are carrying out the intent of the parties to the contract." *Long*, 776 S.W.2d at 413. Furthermore, "[a]lthough Missouri courts have used mortgage law concepts in addressing the equities of ordering specific performance of a contract for deed, Missouri courts have not yet gone further and treated a contract for deed as a conventional mortgage." *Id.* at 414.

> But, just as a debtor under a deed of trust must tender full payment of the total amount due in order to accomplish statutory redemption, so also the purchaser under a contract for deed must make a similar tender of the full purchase amount in order to be entitled to specific performance.[10]

*Id.*

■ With that being said, " '[t]he cardinal rule in the interpretation of a contract is to ascertain the intention of the parties and to give effect to that intention.' " *Kells v. Missouri Mtn. Prop., Inc.*, 247 S.W.3d 79, 85 (Mo.App.2008) (quoting *Mid Rivers Mall, L.L.C. v. McManmon*, 37 S.W.3d 253, 255 (Mo.App.2000)). "Courts are bound to enforce a contract as written if the terms of the contract are clear, plain and unequivocal...." *Id.* There is substantial evidence in the record confirming that Appellant defaulted under the terms of the Contract by not paying the monetary installments when due. Respondent's filing of the Quit–Claim Deed and re-possession of the Hotel was in compliance with the terms of the Contract and the Note. In our review of the record, we agree with the trial court's finding that "[t]he retaking of possession of the Hotel by [Respondent] was done without any breach of the peace and was consistent with the contract provisions...." The trial court did not err in finding Respondent, as assignee of Kingfisher's interest in the Contract and attendant business, lawfully regained possession of the Hotel as its rightful and lawful owner. Points II and III are denied.

In his fourth point relied on, Appellant asserts the trial court erred "in finding that the forfeiture of the amounts paid by [Appellant] under the [C]ontract did not constitute an unconscionable penalty...." He argues that it is the law of the State of Missouri that

> a liquidated damages clause in a contract will be considered a penalty and will not be enforced if the forfeited amounts are in an amount which is unreasonable in light of anticipated actual

---

9. Additionally, while Appellant asserts in his points relied on that "state law requires that a property owner who seeks to reclaim possession of real property may not do so by force of deception but must resort to the remedy provided by law ..." he does not cite this Court to any statutes or recent cases containing such a requirement. He merely cites to the two cases analyzed above, which this Court feels are not at all similar to the facts presented in this case.

10. Here, the record is devoid of a showing that Appellant made such a tender.

losses in that the uncontroverted evidence in this case established that [Appellant's] forfeited payments exceeded $600,000[.00] and that figure would far exceed any actual losses suffered by [Respondent].[11]

Under this point relied on, Appellant essentially argues that he paid in excess of $600,000.00 under the Contract and the Note; that the Hotel is valued at $1,700,000.00; that the forfeiture of his payments made under the Contract and the Note was an unreasonable penalty for him to pay for his default, despite the fact that the Contract contained a liquidated damages provision; and that he is entitled to the difference between what he paid pursuant to the transaction and the actual value of the loss suffered by Respondent.[12] He asserts that the forfeiture of his payments should be deemed to be an unreasonable penalty such that the forfeiture should not have been enforced. In support of this proposition, Appellant cites this Court to a single case, *Valentine's Inc. v. Ngo*, 251 S.W.3d 352, 352–54 (Mo.App. 2008), a case involving a lease agreement with a liquidated damages clause, for the proposition that "[g]enerally, liquidated damages will be enforced if they are in an amount that is reasonable in light of anticipated actual losses caused by the breach and the exact amount of actual damages would be difficult to establish." He then maintains that "[i]n the present case the amount claimed as liquidated damages far exceeds any actual loss."

■ While Appellant's citation to *Valentine's*, 251 S.W.3d at 354, is a correct statement of the law, we find the contract for deed case of *Long*, 776 S.W.2d at 413,

cited by Respondent in its brief, is more germane and instructive based on the fact pattern in the present case. In *Long*, the parties executed a contract for deed which contained a forfeiture provision similar to the one found in the Contract at issue here. *Id.* at 410–412. The defendant then defaulted on the contract and the plaintiff "filed a [claim for rent and possession of the property] alleging that [the defendant] purchased property from her under contract for deed, but became a tenant pursuant to the forfeiture clause of the contract." *Id.* at 410. The defendant then "filed a counterclaim for specific performance and for damages." *Id.* The issue at trial centered on "conflicting evidence regarding [the defendant's] default in monthly payments." *Id.* at 411. Following a bench trial, the trial court "entered judgment in favor of [the plaintiff] and awarded her damages in the amount of $5,850[.00], and possession of the property. The court further entered judgment against [the defendant] on the counterclaim." *Long*, 776 S.W.2d at 410. The defendant appealed. *Id.*

On appeal, the Western District of this Court stated:

[c]ontracts for deed typically contain forfeiture clauses which provide that time is of the essence and that when a buyer defaults, the seller has the option to declare the contract terminated, retake possession of the premises, and retain all previous payments as liquidated damages. Contracts for deed have traditionally been governed by general principles of contract law and courts have enforced forfeiture clauses on the assumption that

11. Appellant maintains that under the Contract and the Note he made payments in a total amount of $662,857.58; however, Ms. Garey contends Appellant made payments totaling $608,876.00.

12. Appellant asserts he is entitled to an award of $366,144.00 which is the difference between $1,333,856.00, the balance due under the Contract and the Note at the time of the repossession by Respondent, and $1,700,000.00, the resale price of the Hotel.

they are carrying out the intent of the parties to the contract.

In Missouri, there is no legislative limitation on the forfeiture remedy in a real estate financing involving contracts for deed.

*Id.* at 413 (internal citations omitted). The reviewing court went on to explain that oftentimes

> courts have avoided the result of a forfeiture by creating the concept of equitable redemption. These courts have found that equity's ability to cure unfairness in the context of a contract for deed is analogous to the right of a mortgagor to redeem under a mortgage. But, just as a debtor under a deed of trust must tender full payment of the total amount due in order to accomplish statutory redemption, so also the purchaser under a contract for deed must make a similar tender of the full purchase amount.... Although Missouri courts have used mortgage law concepts in addressing the equities of ordering specific performance of a contract for deed, Missouri courts have not yet gone further and treated a contract for deed as a conventional mortgage. Missouri courts continue to allow the seller to exercise the forfeiture clause of a contract for deed, subject to equitable protection.

*Id.* at 414 (internal quotations and citations omitted). The reviewing court further found that it was common practice for trial courts "enforcing a forfeiture clause in a contract for deed [to] permit the seller who is not in default to cease performance on his part and retain all sums previously paid by the defaulting purchaser without finding an impermissible penalty." *Id.* at 415. As such, the reviewing court upheld the trial court's ruling that the forfeiture provision was reasonable. *Long,* 776 S.W.2d at 416.

In the present matter, we discern that the amount of $366,144.00 requested by Appellant is a figure arrived at using the "equity of redemption" theory discussed in *Id.* at 414, which is essentially, again, a request by Appellant that this Court treat the Contract not as a contract for deed but as a mortgage such that this Court should apply foreclosure principles to the present matter as opposed to contract interpretation principles.[13] As already stated above, we look to the intent of the parties as set out in the language of the Contract and we are "bound to enforce [the Contract] as written [where] the terms are clear, plain and unequivocal...." *Kells,* 247 S.W.3d at 85. Here, the Contract clearly contains a forfeiture clause which allows Respondent to keep all monies paid to it by Appellant in the event of Appellant's default. As explained in *Long,* 776 S.W.2d at 415–16, such forfeiture provisions have been upheld in similar factual scenarios. *See Flath v. Bauman,* 722 S.W.2d 125, 130 (Mo.App.1986); *First Nat'l Bank v. King,* 363 S.W.2d 590, 595 (Mo.1963). Furthermore, Appellant operated the Hotel for over two years and was at least $65,000.00 behind in his installment payments under the terms of the Contract and the Note. Additionally, we observe that Appellant purchased the Hotel in an entrepreneurial spirit to turn a profit; and it is clear that Appellant was a savvy businessperson who we discern was aware of the terms of the Contract and the Note and presumably the risks involved in financing with a contract for deed instead of a traditional mortgage as evidenced by the inclusion in his favor

---

13. Under the scenario urged by Appellant, he apparently maintains that in the event the Hotel were to sell for more than the amount owed under the Contract he would be entitled to the surplus, yet if the Hotel were to sell for less than the amount owed under the Contract he would not be liable for any deficiency. In Appellant's argument, he wins either way.

of the non-recourse features of the Note. Based on our review of the record in its entirety, we determine Appellant was not entitled to any "equitable protection." The trial court's determinations as to the issues relating to this point relied on were supported by substantial evidence. *See Kassebaum,* 42 S.W.3d at 692. Point IV is denied.

In his fifth point relied on, Appellant asserts error in the trial court's determination that Respondent "did not convert any of [Appellant's] personal property ..." because the law is clear that "a party who assumes unauthorized control over the personal property of another has committed the tort of conversion...." He maintains the evidence in the present matter was uncontroverted that Appellant "had cash and personal property on the hotel premises when [Respondent] unlawfully took possession and that [Respondent] exercised unauthorized control over such property."

■■■ "Conversion is the unauthorized assumption of the right of ownership over the ... property of another to the exclusion of the owner's rights." *Bell v. Lafont Auto Sales,* 85 S.W.3d 50, 54 (Mo.App. 2002). Conversion requires an intentional exercise of dominion or control over property that so seriously interferes with the owner's right of control that the interferer may justly be required to pay the owner the full value of the property. *Weicht v. Suburban Newspapers of Greater St. Louis, Inc.,* 32 S.W.3d 592, 597 (Mo.App. 2000). Conversion is proven by establishing:

(1) a tortious taking; (2) any use or appropriation to the use of the person in possession, indicating a claim of right in

opposition to the true owner's rights; or (3) by a refusal to give up possession to the owner on demand, even though the defendant's original possession of the property was proper.

*Mackey v. Goslee,* 244 S.W.3d 261, 263–64 (Mo.App.2008) (quoting *R.J.S. Sec., Inc. v. Command Sec. Serv., Inc.,* 101 S.W.3d 1, 15 (Mo.App.2003)). "In order to recover under a theory of conversion, [Appellant] must show that [he] had the right to possession of the converted property at the time of the alleged conversion." *Mertz v. Blockbuster, Inc.,* 32 S.W.3d 130, 133 (Mo. App.2000).

■■■ At trial, Appellant testified that during the time he owned the Hotel he purchased various items of personal property for the Hotel's benefit such as a "handful" of television sets, a "[c]hair," "numerous lamps," sixty-six mattresses, brand new "bed clothes" and towels, two computers with accompanying printers, "a flatscreen TV," a "chair [and] table for the breakfast area," a waffle maker, a toaster, and maintenance tools.[14] He related he also brought in a number of chairs from another hotel he owned and he kept at least $300.00 in cash in a drawer in the Hotel's office. He also related there were outstanding accounts receivable owed to him at the time Respondent took over the Hotel due to the fact that he had agreements with several tour companies that booked rooms and then paid for them at a later date. Appellant also testified he was never able to recover any of the aforementioned personal property. On cross-examination, Appellant admitted that the personal property at issue was not separately set out in any of the Hotel's income state-

---

14. An exhibit detailing the exact items of personal property claimed by Appellant was entered into evidence at trial as part of Appellant's "Exhibit No. F." Exhibit No. F stated that Appellant had $46,250.00 in personal property remaining in the Hotel on the date Respondent took control of it and that he arrived at this value by determining the "garage sale" resale price of the items on the list.

ments, but he insisted the items would have been listed in the "purchase" or "expense[s]" categories on those statements. When confronted with the fact that the income statements contained neither an expense nor a purchase category, he ultimately concluded the items must have been allocated to the "hospitality" category "[a]nd other areas." Saliently, while admitting he was aware that the items at issue were depreciable for income tax purposes, he related he did not depreciate the items.[15]

Frank Suereus ("Mr.Suereus"), who managed the Hotel while Appellant owned it, testified he "believe[d]" Appellant "put some new items in some rooms before ..." he was employed there. He stated that if there was an item destroyed, "like if somebody tore drapes in a room ..." that would be replaced, but otherwise he could not remember any new items in the hotel rooms "when [he] was there...." Mr. Suereus stated that Appellant did bring in "a whole load of new breakfast room furniture from [his other] hotel," but it was "used" furniture that "wasn't in great shape." He also confirmed Appellant's testimony that many of the tour operators paid for their accommodations weeks or months after utilizing hotel facilities and he knew a check for "several thousand dollars" was received at the Hotel weeks after Respondent took over. He also backed up Appellant's testimony that it was common practice for the Hotel to keep approximately $300.00 in cash in the office.

George Shipman ("Mr.Shipman"), Kingfisher's representative, testified that at the time of the transaction with Appellant, Kingfisher retained ownership of all of the Hotel's personal property. He related that his intention was that all of the Hotel's personal property would ultimately be transferred via bill of sale to Appellant upon fulfillment of Appellant's payment obligations under the Contract and the Note. He stated he discussed this with Appellant during the transaction negotiations and Appellant understood that "he gets what's there, you know, when all the obligations have been met." He also admitted that the issue of personal property was not specifically covered by the Contract and the Note executed between Appellant and Kingfisher. He further related he was not aware prior to the litigation at issue that Appellant had purchased any personal property for the Hotel, but that even if he had been aware of such items it was standard knowledge in the hotel industry that items are always in need of being replaced and "you can't say this part's mine; this part's X guy's. You know—[it] doesn't work that way."

Based on the foregoing, the trial court found "[n]either the [C]ontract nor the [N]ote made any reference to personal property and no bill of sale for personal property was given ... to [Appellant]." It went on to restate Mr. Shipman's testimony that Appellant

> would have been given a bill of sale for the Hotel personal property upon full payment of the [C]ontract and [the N]ote, neither the [C]ontract nor any other document transferred ownership of any personal property to [Appellant]. Thus the [trial c]ourt does not find there was any conversion of the personal property of the Hotel.

The trial court went on to find that "[t]he evidence offered by [Appellant] that he put $46,350.00 of new or replacement personal property in the Hotel was not credible."

We agree with the trial court that Appellant failed to prove by a preponderance

---

**15.** While testifying that he paid for these items with checks and credit cards, Appellant did not introduce proof relating to the actual purchase, the purchase price or date of purchase of any of the items on the list.

of the evidence that Respondent wrongfully converted various items of his personal property. Turning to the individual, physical items of personal property set out in Appellant's Exhibit No. F, we first note there was no tangible proof offered by Appellant as to the purchase price or value of the items at issue; there were no receipts and little, if any, other probative evidence provided to the trial court to prove even the existence of the items at issue; and there was no other documentation provided to show the items at issue were located on the Hotel's property at the time Respondent took it over. Second, any expenses or allowances for the purchase or procurement of these items were not reflected in any of the financial documentation, such as income statements, provided to the trial court or to this Court. In fact, the majority of the testimony offered as to the existence of these items was offered through Appellant's testimony, which was specifically found by the trial court to be non-credible, and this Court defers to the trial court on issues of witness credibility. *See Kassebaum,* 42 S.W.3d at 692.

Likewise, Appellant's contention that he was the owner of cash on hand and accounts receivable also fails. It is clear that "an action for 'conversion does not lie for the wrongful taking of money.' " *Moore Equip. Co. v. Callen Const. Co., Inc.,* 299 S.W.3d 678, 681 (Mo.App.2009) (quoting *K–Smith Truck Lines, Inc., v. Coffman,* 770 S.W.2d 393, 398 (Mo.App. 1989)). Actions for the conversion of " '[n]otes, bills, checks, and other representatives of value' " can be maintained where there is evidence of the specific value of the items. *Id.* There was no evidence as to the value of the check Mr. Suereus testified was received by the Hotel shortly after Respondent took control, and there was no evidence offered by any witness that there was definitely cash in the office at that time. As such, these claims by Appellant fail. There was sufficient evidence supporting the trial court's determination. The trial court did not err in finding Respondent did not convert Appellant's personal property. Point V is denied.

The judgment of the trial court is affirmed.

LYNCH and BURRELL, JJ., concur.